ANNIE HOLDORF, Appellant, v. CHARLES HOLDORF et al.,
Appellees.

HUSBAND AND WIFE: Alienation—Evidence. Evidence reviewed, and held insufficient to present a jury question on the issues whether a defendant (1) had alienated the affections of a spouse, or (2) had conspired so to do.

*Appeal from Pottawattamie District Court.*—EARL PETERS, Judge.

JUNE 25, 1921.

ACTION for alienation of affections. A verdict was directed in favor of the defendant Charles Holdorf, and plaintiff appeals. It appears from the record that a verdict was returned against the appellee Sophie Holdorf, and a motion for a new trial as to said defendant was sustained. No question is raised in regard to the case against Sophie Holdorf on this appeal.—*Affirmed.*

*F. A. Turner* and *Cullison & Wyland,* for appellant.

*Preston & Dillinger,* for appellees.

FAVILLE, J.—The appellant and her husband were married December 24, 1913. The appellees are the parents of appel-

lant's husband. At the time of the marriage, the appellant was 18 years of age, and her husband was 22. The parents of both parties to the marriage were farmers, and lived about 10 miles apart. The young people had been acquainted for 3 years prior to the marriage. Immediately after the marriage, the young people went to the home of the appellees, and remained there until the following spring. The appellant testified in regard to various transactions which, it is claimed, alienated her husband's affections.

In March, 1914, a birthday party was given for the appellant at the home of the appellees. The appellee Charles was present on this occasion. For some reason, not altogether explained in the evidence, Charles saw fit to participate in the festivities of the birthday party by joining in an altercation with the appellant's husband, William, over a batten that in some way had been knocked from the side of the barn. The controversy waxed warm, and Charles produced a gun and threatened to shoot William. It appears that William became frightened, and removed himself somewhat hastily from the presence of his irate parent, and, notwithstanding the temptations of the banquet table which had been spread for the guests in honor of the wife's birthday, he thought "discretion was the better part of valor," and remained out of sight, and regaled himself in the kitchen. The mother-in-law appears to have intervened in the difficulty, and, a few days afterward, an armistice appears to have been entered into, and the young people abandoned the shelter of the home roof and moved to a half-section farm owned by the appellees, situated a mile or two from the old home. After the young people moved to the half-section farm, the appellees lived in Colorado, returning to Iowa only occasionally.

It also appears that there was a large amount of stock on the half-section farm to which the young people moved, and that some arrangement was made between the parties by which the son was to receive one half of the increase of the stock, and the other profits on the farm were to be divided between father and son.

The appellant testified that she thinks the appellee Charles visited them in September or October, 1915, but nothing un-

usual appears to have happened at this time. It appears from appellant's testimony that, in the fall of 1914, the appellee's wife, Sophie, upbraided the appellant, in the presence of appellant's husband. At this time, Sophie accused the appellant of being lazy, declared that it was not necessary for her to use white tablecloths, and protested that appellant did not take care of the milk in a proper manner. The appellee Charles was not present when this conversation took place.

Some time in August of the same year, it also appears from the evidence, there had been some controversy between the two families about some ponies. One morning, the appellee Charles drove into the yard, where the appellant was at the well, pumping water. It appears from the evidence that he picked up a stick in the yard, approached the appellant, and accused her of having made trouble between his children. Appellant testifies that he brandished the stick in the air, and greatly frightened her. William does not appear to have been present on this occasion.

Nothing untoward appears to have taken place between the parties thereafter until the latter part of February, 1916. At that time, the appellee Charles and his wife were in Colorado. It appears that there was some correspondence between William and his father in regard to his remaining on the place, and in regard to the execution of notes for money which Charles claimed was due him from William. One day in the latter part of February, William telephoned to appellant's father, Peter Danker, requesting him to come over to their home. The same day, he also telegraphed to his father, who was then in Colorado, to come to Iowa. The cause of the summons to the respective fathers of the young people is not disclosed in the record. Charles, however, was sick in Colorado, and did not come; but instead, his wife, Sophie, arrived in Iowa in a few days, and went to the old home, and called the young people on the telephone. The appellant answered the telephone. The mother-in-law inquired in regard to the family, and asked to talk with her son, and shortly after the talk, the son went up to the home place. Upon his return, he was crying, and told the appellant that his mother would not make any settlement with him, and that she claimed that he owed his parents a large amount of

money, which William insisted he did not owe. That evening, the appellant telephoned to her mother-in-law, and requested her to come down to the appellant's home, which she did. After her arrival that evening, Sophie requested the appellant and her husband to sign certain notes, and some controversy appears to have arisen in regard to how much, if anything, was owing to the parents. The appellant testified that her mother-in-law appeared to have been angry on that occasion, and said that, if the appellant and her husband would not sign the notes, they would have to move off the farm in three days, and that they could not live together any longer. During the evening, the mother-in-law sought to take the baby, which the appellant was holding, and, objection being made, the mother-in-law thereupon slapped the appellant's face. The appellant then said to her mother-in-law that the latter wanted her to get a divorce from her husband, and to this the mother-in-law replied, "Yes, to-morrow." The husband at this time took sides with his wife, and ordered his mother to leave the house. This she objected to doing, and insisted that she would stay all night; but the son was obdurate, and demanded that she go, and in about 15 minutes, she left.

The appellant and her husband spent that night packing their furniture, intending to move away. Early the next morning, the husband went up to see his mother, to see if he could not effect a settlement of the matters between them. He returned shortly, and told the appellant that he could do nothing with his mother. About this time, the appellant's father, Danker, appeared on the scene, and, desiring to act as a peacemaker, advised the husband to see his mother again, and ascertain if he could not effect a settlement and stay longer on the farm where they were. Rather impulsively, the husband again left, with the declared purpose that he would see his mother and force a settlement.

He left in his work clothes, on horseback, in the direction of his old home. He never returned. The mother told the appellant over the telephone that the son had gone to Colorado, to see his father on business, and that he would be back in a few days.

Arriving in Colorado, however, he executed a written instru-

ment conveying his personal property to his father. He re-
mained in Colorado, and wrote a letter to the appellant, declar-
ing that he would not live with her any longer. The property
conveyed by the written instrument executed in Colorado was
subsequently taken by legal process from possession of appellant.

The foregoing comprises the substance of the material evi-
dence in the case in behalf of the appellant. Upon this record,
the court directed a verdict in favor of the appellee Charles.
This ruling by the court was correct. There was no sufficient
proof whatever, under this record, upon which to hold this ap-
pellee for damages for alleged alienation of the affection of the
appellant's husband.

The only incidents proven in the record to connect the ap-
pellee directly with transactions with the son are the two re-
ferred to: one when he threatened to shoot the son at the birth-
day party because there was a broken batten on the barn; the
other when he drove into the yard one day, and brandished a
stick in the presence of the appellant. Just exactly what ef-
fect the warlike demonstrations at the birthday party had upon
the affections of the husband is not disclosed by the testimony,
except that it appears that thereafter William avoided the pres-
ence of his father, and sought the solicitude and comfort of his
wife. He stayed away from the festal board, and, fear not
having departed altogether from his heart, when they retired
that night, the young couple pulled the bed in front of the un-
locked door, to prevent intrusion.

The husband does not appear to have been present at the
time of the demonstration with the stick, nor is there any evi-
dence that he lost any affection for his wife because thereof.

The only other thing connecting the appellee Charles with
the alleged alienation of affections is the inference that might
be drawn as to what took place between the son and his father
in Colorado, when they settled their property matters and the
son wrote to his wife that he was not coming back. This, how-
ever, is the merest inference.

It is claimed, however, that the case should have gone to
the jury on the question of conspiracy between the father and
mother to alienate the affections of the son. Regarding the mat-

ter of conspiracy in a case of this character, under somewhat similar facts, we said, in *Pooley v. Dutton*, 165 Iowa 745:

"If the father is also to be held liable, it must be because it is found that he himself wrongfully and maliciously interfered between his daughter and her husband, and by his advice, persuasion, or influence, maliciously exercised, alienated her from her love and loyalty to her husband. He is in no manner to be held liable or responsible for the acts, words, or conduct of the mother, or for the influence, if any, exercised by the mother over the daughter, unless it be further affirmatively established by the evidence that there was a conspiracy or combination between the mother and himself to wrongfully and maliciously influence and bring about a separation between the plaintiff and his wife, and that the wrongful acts were done and wrongful influence was exercised by the mother in pursuance or furtherance of the conspiracy so formed or existing. If such conspiracy be found, then, of course, the acts done and the words said by either in carrying out the common design are the acts and words of both."

See, also, *Heisler v. Heisler*, 151 Iowa 503.

Applying these rules to the instant case, there is an utter want of evidence to show any act of conspiracy or combination between the mother and the appellee Charles, to wrongfully and maliciously influence and bring about a separation between the appellant and her husband, or that the wrongful acts were done and the wrongful influence exercised by the mother in pursuance or furtherance of a conspiracy so formed or existing.

We fail to find in the record any sufficient evidence from which a jury could be warranted in finding that there was any such unlawful combination or conspiracy between the appellee and his wife as could make the appellee Charles liable in this action.

The action of the lower court in directing a verdict in favor of the appellee Charles Holdorf was correct. No other question is before us. The judgment appealed from is—*Affirmed.*

EVANS, C. J., STEVENS and ARTHUR, JJ., concur.